Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Joanna Rosenblatt (JR 3359)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,   GEICO   INDEMNITY   COMPANY,
GEICO  GENERAL  INSURANCE  COMPANY  and
GEICO CASUALTY COMPANY,                                              Docket No.: _____(      )

                                    Plaintiffs,

               -against-

IDEAL CARE PHARMACY, INC., and
LEONID NAISHULER,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

        Plaintiffs  Government  Employees  Insurance  Company,  GEICO  Indemnity  Company,

GEICO  General  Insurance  Company  and  GEICO  Casualty  Company  (collectively,  "GEICO"  or

"Plaintiffs"),  as  and  for  their  Complaint  against  Defendants,  Ideal  Care  Pharmacy,  Inc.,  and  Leonid

Naishuler  (collectively,  "Defendants"),  hereby  allege  as  follows:

        1.        This  action  seeks  to  terminate  an  on-going  fraudulent  scheme  perpetrated  by  the

Defendants  who  have  exploited  the  New  York  "No-Fault"  insurance  system  by  submitting  more

than $2 million in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent claims to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products, primarily in the form of topical Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment (collectively, the "Fraudulent Topical Pain Products"), as well a limited number of other medications including oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      Defendant Ideal Care Pharmacy, Inc. ("Ideal Care" or the "Pharmacy") and Defendant Leonid Naishuler ("Naishuler") (collectively, the "Pharmacy Owner Defendants") dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"). To exploit the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices.

3.      In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements, in exchange for kickbacks or other financial incentives, the Defendants steered the Prescribing Providers and Clinic Controllers to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to Ideal Care. These

prescriptions were frequently generated using preprinted template prescription forms in violation of law and at times contained stamped, or photocopied signatures.

4.        The Defendants' scheme to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Ideal Care for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Ideal Care typically submitted claims to GEICO seeking approximately $2,599.00 for a single tube of Diclofenac Sodium Gel 3% and between approximately $1,681.00 and $2,100.00 for a single tube of Lidocaine 5% Ointment. The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to patients' health, safety, and well-being.

5.        By this action, GEICO seeks to recover more than $527,000.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Ideal Care of over $1.17 million in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Ideal Care because:

(i)      The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ideal Care in exchange for unlawful kickbacks and other financial incentives;

(ii)     Ideal Care billed for pharmaceutical products that were prescribed and dispensed pursuant to illegal, collusive agreements, as well as predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(iii)    The Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and caused Ideal Care to dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(iv)    The Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted

charges for the Fraudulent Pharmaceuticals under the name of Ideal Care pursuant to illegal and invalid prescriptions.

6.      The Defendants fall into the following categories:

(i)     Ideal Care is a New York corporation engaged in a fraudulent scheme in which it dispenses the Fraudulent Pharmaceuticals, pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which it is not entitled; and

(ii)    Naishuler is the record owner of Ideal Care since 2012.

7.      The Defendants' scheme began in 2020 and continues through the present day.

8.      As discussed more fully below, the Defendants at all times have known that: (i) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ideal Care in exchange for unlawful kickbacks and other financial incentives; (ii) the Fraudulent Pharmaceuticals billed through Ideal Care were medically unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Ideal Care dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal and invalid prescriptions.

9.      Based on the foregoing, Ideal Care does not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-

date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $527,000.00.

## THE PARTIES

### I.      PLAINTIFFS

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     DEFENDANTS

11.     Defendant Ideal Care is a New York corporation, formed on or about August 14, 2012. Its current principal place of business is 811 Avenue U, Brooklyn, New York.

12.     Ideal Care knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

13.     Defendant Naishuler resides in and is a citizen of New York. Naishuler is the owner of Ideal Care.

14.     Ideal Care received prescriptions from, among other locations, a No-Fault Clinic that was identified in an ongoing criminal proceeding, captioned USA v. Rose, 19-cr-00789 (PGG).  In that criminal proceeding, the US Government has credibly alleged that the laypersons who own the various No-fault medical clinics (i) pay kickbacks to hospital workers, medical service providers, and police officers in exchange for confidential information of motor vehicle accident victims in New York; and (ii) accept kickbacks in exchange for allowing healthcare

providers access to patients so they can bill for medically unnecessary services for patients being treated, or allegedly treated, at the No-Fault Clinics.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

19.     GEICO underwrites automobile insurance in the State of New York.

20.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

22.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

23.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

24.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

25.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

26.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Laws

27.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

28.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

29.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

30.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug

interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

31. New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

32. New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

33. New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

34. New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

35. New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

36. Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

37.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

38.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

39.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

### III.     The Defendants Scheme Involving the Fraudulent Pharmaceuticals

#### A.  Overview of the Scheme

40.     Beginning in 2020 and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they used Ideal Care to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

41.     Ideal Care purports to be a storefront neighborhood pharmacy operating in Brooklyn, New York but instead operates as part of a large-scale fraud scheme that exploited GEICO's Insureds as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

42.     Ideal Care has been submitting billing to GEICO since 2014 but in 2020 began to participate in the fraud scheme described herein, focusing its business on a limited set of

pharmaceutical products (i.e., the Fraudulent Topical Pain Products), rather than dispensing a wide variety of pharmaceutical products like legitimate pharmacies.

43.      Indeed, approximately 88% of the billing the Defendants submitted to GEICO through Ideal Care since 2020 is for Fraudulent Topical Pain Products – primarily consisting of Lidocaine 5% Ointment ("Topical Lidocaine") and Diclofenac Sodium Gel 3% ("Topical Diclofenac") and resulting in claims for reimbursement of at least $2 million.

44.      By contrast, between 2014 and 2019, prior to Ideal Care's involvement in the fraudulent scheme described herein, billing for the Fraudulent Topical Pain Products comprised significantly less of Ideal Care's total billing submitted to GEICO- approximately 10%.

45.      Not only did Ideal Care experience an unprecipitated increase in billing for the Fraudulent Topical Pain Products, but between 2019 and 2020 when the Pharmacy began participating in the fraudulent scheme described herein Ideal Care's overall billing to GEICO increased by over 2,700%, from approximately $13,000.00 to over $371,000.00.

46.      What is more, due to Ideal Care's continued involvement in the fraudulent scheme described herein, between 2020 and 2021 during the COVID-19 pandemic and without engaging in virtually any marketing or advertising, the Pharmacy's billing to GEICO increased again by over 347% from approximately $371,000.00 to over $1.65 million.

47.      In keeping with the fact that Ideal Care began participating in the fraudulent scheme in 2020, over 96% of Ideal Care's total billing to GEICO was submitted between 2020 and 2022.

48.      In addition to the substantial and otherwise inexplicable change in the volume and nature of the billing submitted by Ideal Care to GEICO, the prescriptions for the Fraudulent Topical Pain Products directed to Ideal Care were typically based on generic, preprinted, and

boilerplate examination reports that are meant to justify continuous, voluminous, excessive healthcare services, including prescriptions for pharmaceuticals.

49. Further, the prescriptions for the Fraudulent Topical Pain Products dispensed by Ideal Care were (i) directed to Ideal Care from prescribing practitioners and No-Fault Clinics that have been the subject of criminal actions, investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices; (ii) consisted of prescription products (diclofenac gel and lidocaine ointment) as to which the U.S. Department of Health & Human Services, Office of Inspector General ("OIG") has raised concern about "potential fraud and abuse related to both diclofenac and lidocaine." See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018); and (iii) were at times duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

50. In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers where, in exchange for the payment of kickbacks of other financial incentives, they steered the Prescribing Providers and the Clinic Controllers to prescribe large volumes of medically unnecessary Fraudulent Topical Pain Products to Insureds treating at various No-Fault Clinics and to direct those prescriptions to Ideal Care.

51. Specifically, the Defendants paid unlawful kickbacks or provided other incentives to the Prescribing Providers and Clinic Controllers and, in exchange, the Prescribing Providers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific prescription drugs with exorbitant profit margins (i.e., the Fraudulent Topical Pain Products) and routed those

prescriptions to the Defendants.  This permitted the Defendants to submit egregious claims for reimbursement for the Fraudulent Topical Pain Products to GEICO through Ideal Care.

52.     In keeping with the payment of kickbacks by Defendants, Ideal Care issued at least one check to an entity that appears to have no legitimate business operations, which check was illegally exchanged for cash at a check-cashing facility in New Jersey by an individual named Alla Kuratova. Kuratova has exchanged more than $35 million in checks, payable to hundreds of persons/healthcare entities besides Ideal Care, for cash. See Gov't Empl. Ins. Co., et al. v. Zilberman, et al. Docket No. 1:20-cv-00209(FB)(RML), Docket No. 71.  Kuratova was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.

53.     What is more, certain of the Prescribing Providers and the No-Fault Clinics that were the source of prescriptions steered to Ideal Care have been the subject of criminal actions, investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and/or professional disciplinary actions, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

54.     The Prescribing Providers' history of professional misconduct, insurance fraud, or criminal activity limited their opportunity to find employment at legitimate medical offices or to develop their own legitimate practices, leaving them to work for unlicensed laypersons at the No-Fault Clinics with their fraudulent treatment and billing protocols.

55.     For example, Alexander Baldonado, M.D. ("Dr. Baldonado") was recently indicted on six counts of health care fraud in the District of New Jersey. The United States Government has alleged Dr. Baldonado ordered expensive and unnecessary cancer genetic testing for Medicare

beneficiaries, and billed Medicare for services, including office visits, that were never provided. U.S. v. Baldonado, 2:21-cr-00430(SDW)(1).

56.     Michael Alleyne, M.D. ("Dr. Alleyne") purportedly treated automobile accident victims through Metro Pain Specialists, P.C. ("Metro Pain") and steered prescriptions to Ideal Care. Metro Pain has been named as a defendant in multiple no-fault insurance fraud cases involving fraudulent services billed to No-fault insurers based on allegations that it was controlled by laypersons and engaged in illegal kickback and referral arrangements. See State Farm Mut. Ins. Co., et al. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y.); Allstate Ins. Co., et al. v. Metro Pain Specialists P.C., et al., 21-cv-05586 (E.D.N.Y.) (collectively, the "Metro Pain Cases"). Dr. Alleyne also admitted guilt in 1991 in response to a series of charges file by the New York State Department of Health, Office of Professional Medical Conduct which resulted in seven-year license revocation that was converted to probation.

57.     Hong Sik Pak, M.D. ("Dr. Pak") has a history of professional misconduct which resulted in discipline from the New Jersey State Board of Medical Examiners, including assessing Dr. Pak a $5,000.00 penalty and a public reprimand in 2009.  In December 2009, the Pennsylvania Department of State reprimanded Dr. Pak and assessed a $2,000.00 civil penalty for Dr. Pak's failure to timely report the New Jersey disciplinary action to the Pennsylvania Board of Medicine.

58.     Furthermore, the No-Fault Clinics from which prescriptions were steered to Ideal Care present themselves to be legitimate healthcare practices when, in fact, they are known No-Fault medical mills that house a "revolving door" of numerous healthcare providers who subject Insureds to as many healthcare goods and services as possible in order to exploit the Insureds' No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

59.     For example, GEICO has received billing from 788 Southern Boulevard, Bronx, New York (the "788 Southern Boulevard Clinic") and 1975 Linden Boulevard, Elmont, New York (the "Linden Boulevard Clinic") from over 100 purportedly different healthcare providers each.

60.     GEICO has received billing from 146 Empire Boulevard, Brooklyn, New York (the "Empire Boulevard Clinic") from approximately 90 purportedly different healthcare providers.

61.     GEICO has also received billing from 3027 Avenue V, Brooklyn, New York (the "Avenue V Clinic") and 3041 Avenue U, Brooklyn, New York (the "Avenue U Clinic") from over 70 purportedly different healthcare providers each.

62.     What is more, Ideal Care received prescriptions from a No-Fault Clinic located at 717 Southern Boulevard Bronx, New York (the "717 Southern Boulevard Clinic") that was identified in an on-going criminal proceeding, USA v. Rose, 19-cr-00789 (PGG). In that criminal action, the United States of America credibly alleged that the laypersons who own the clinics (i) pay kickbacks to hospital workers, medical service providers, and police officers in exchange for confidential information of motor vehicle accident victims in New York; and (ii) accept kickbacks in exchange for allowing healthcare providers access to patients so they can bill for medically unnecessary services for patients being treated, or allegedly treated, at the No-Fault Clinics.

63.     These No-Fault Clinics were the primary source of prescriptions that were routed to Ideal Care by the Prescribing Providers and Clinic Controllers operating therefrom and submitted by the Defendants in support of their fraudulent charges.

64.     In keeping with the fact that the Defendants illegally steered the Prescribing Providers and the Clinic Controllers at the No Fault Clinics to provide Ideal Care with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were rarely given the option to use a pharmacy of their choosing.

65. Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Ideal Care, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

66. In many cases, Ideal Care either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the various No-Fault Clinics.

67. At times, the Insureds were not even aware that a Fraudulent Pharmaceutical dispensed by Ideal Care was prescribed to them until the medication was delivered to them or distributed to them by the front desk staff.

68. What is more, at times, Ideal Care submitted billing to GEICO for Fraudulent Pharmaceuticals that were never dispensed to an Insured.

69. In furtherance of the scheme, the Defendants used what is essentially a product list – disguised as a "prescription order form" – of the various Fraudulent Pharmaceuticals that Ideal Care dispensed.

70. The pre-printed "checklist-type" prescription order forms (the "Fraudulent Prescription Forms") list the names of the Fraudulent Pharmaceuticals the Defendants dispense and bill for, and the quantity in which they were to be prescribed and dispensed to Insureds.

71. The Fraudulent Prescription Forms ensured that the Prescribing Providers would prescribe, or the Clinic Controllers would cause to be prescribed, specifically targeted predetermined Fraudulent Topical Pain Products (i.e., "Lidocaine 5% Ointment," "Diclofenac Sodium 3% Gel," and "Lidocaine Patch 5%") so that the Pharmacy Defendants could submit those prescriptions to GEICO in support of the claims for reimbursement at egregiously inflated rates.

Additionally, the Fraudulent Prescription Forms allowed the Prescribing Providers to prescribe other Fraudulent Pharmaceuticals, including predetermined oral NSAIDs and muscle relaxers to further increase the Defendants' profits.

72.     The Prescribing Providers allegedly chose which predetermined product(s) should be dispensed to the Insureds by marking off or circling one of designated boxes on the Fraudulent Prescription Forms.

73.     New York law prohibits Ideal Care from using a "prescription order form" and dispensing pharmaceuticals in response to these types of forms with multiple drug products, and likewise prohibits the Prescribing Providers from writing prescriptions on these types of forms.

74.     As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

75.     In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.   See, N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

76.     The Fraudulent Prescription Forms are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescription blanks bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

77.     The Fraudulent Prescription Forms also are invalid and illegal in that New York

Education Law prohibits pharmacists from dispensing multiple drugs listed on the same

prescription – each prescription medication should be written on its own separate prescription.  Id.

78.     Specifically, New York Education Law § 6810(7) provides as follows:

"No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug. No drug shall be dispensed by a pharmacist when such prescription form includes any other drug."

79.     The Defendants violated Education Law § 6810(7) by creating, distributing, using

and/or dispensing against Ideal Care's Fraudulent Prescription Forms.

80.     Moreover, many of the Fraudulent Prescription Forms contained a preprinted,

generic "Statement of Medical Necessity" alleging that topical pain products were necessary to

avoid side effects of orally administered medications, and to lower doses of and prevent

dependence on oral medications.  Specifically, the Fraudulent Prescription Forms contained the

following preprinted statement:

Statement of Medical Necessity:

Side effects associated with oral administration can often be avoided when medications are used topically. When medications are administered topically, they are not absorbed through gastrointestinal system and do not undergo first-pass hepatic metabolism. Topical creams/patches will be used in conjunction with lower doses of oral medications to prevent dependence and side effects of oral medications.

81.     The "Statement of Medical Necessity" included on these prescriptions holds no

pharmacologic validity.  First-pass hepatic metabolism is a process where drugs absorbed from the

gastrointestinal tract travel first to the liver through the portal vein, where a fraction of drug is

broken down and removed from the bloodstream. While the amount of the drug removed from the

bloodstream through first-pass hepatic metabolism varies from medication to medication, certain

drug ingredients in the Fraudulent Topical Pain Products, such as diclofenac sodium, are not significantly affected by first-pass metabolism and, therefore, can be administered orally with an efficacious outcome. Moreover, first-pass metabolism is irrelevant with regard to the safety of the Fraudulent Topical Pain Products.

82.     Despite the blanket statement purporting to express concern about side effects associated with oral administration, certain Prescribing Providers regularly prescribed oral medications contemporaneous to prescribing a Fraudulent Topical Pain Product.

83.     What is more, the Prescribing Providers often contemporaneously submitted different types of prescriptions, and/or different Fraudulent Prescription Forms to different pharmacies, indicating the protocol for transmitting prescriptions to each pharmacy is set by the pharmacy, not by the Prescribing Provider.

84.     Annexed hereto at Exhibit "2" is a sample of the prescriptions issued by the Prescribing Providers using the Fraudulent Prescription Forms, which the Defendants submitted to GEICO in support of their fraudulent billing through Ideal Care.

85.     The Defendants encouraged certain Prescribing Providers and Clinic Controllers to use the Fraudulent Prescription Forms to steer the Prescribing Providers and Clinic Controllers to prescribe, or cause the prescription of, as many prescriptions as possible for the Fraudulent Pharmaceuticals, in exchange for kickbacks and other financial incentives.

86.     The Defendants used the illegal, invalid, and fraudulent prescriptions to bill GEICO and other insurers millions of dollars for the Fraudulent Pharmaceuticals.

87.     In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements, at times the Fraudulent Prescription Forms submitted to GEICO by the Defendants in support of

the Defendants' claims contained stamped, or photocopied signatures. For example, in support of their claims for reimbursement, the Defendants submitted Fraudulent Prescriptions Forms which appear to contain stamped, electronic, or photocopied prescriptions for the following Prescribing Providers:

    i.    Yanela Duenas, M.D. ("Dr. Duenas") (a representative sample of Fraudulent Prescriptions Forms which appear to contain a stamped, electronic, or photocopied version of Dr. Duenas' signature is attached at Exhibit "3")

    ii.    Arkam Rehman, M.D. ("Dr. Rehman") (a representative sample of Fraudulent Prescriptions Forms which appear to contain a stamped, electronic, or photocopied version of Dr. Rehman's signature is attached at Exhibits "4" – "6")

88.    The Defendants spearheaded their pharmaceutical fraud scheme through Ideal Care knowing that (i) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from Ideal Care to insurers and financially enrich the Defendants; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care, health, or safety; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

### B.  The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care in Order to Exploit Patients for Financial Gain

89.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Ideal

Care – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

90.     Despite this basic goal, the treatment reports for the Insureds who received Fraudulent Pharmaceuticals from Ideal Care almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

91.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that healthcare providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

92.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Ideal Care were based on predetermined protocols designed to exploit Insureds' for financial gain, without regard to the genuine needs of the patients.

93.     To the extent any examination was performed, the Prescribing Providers often failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.  In the event a medical history was documented, such history was not considered and had no influence on the Prescribing Provider's recommended treatment plan for the patient including whether to prescribe Fraudulent Pharmaceuticals.

94.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history, or without considering such history, demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know, or care, whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

95.     The Prescribing Providers did not document in their examination reports any reason why the Fraudulent Topical Pain Products prescribed were medically necessary.

96.     The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products prescribed to a particular patient were used by the patient.

97.     The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

98.     At times, Prescribing Providers appear to have issued prescriptions for Fraudulent Pharmaceuticals – which were ultimately dispensed and billed by the Pharmacy Defendants – without examining the patient on the day the prescription was purportedly issued. For example:

  i.     Insured JF was allegedly involved in a motor vehicle accident on December 6, 2020. Thereafter, he sought treatment at the Avenue V Clinic. On February 10, 2021 Ideal Care dispensed Naproxen and Diclofenac 3% Gel to JF pursuant to a prescription ordered by Dr. Baldonado on February 4, 2021. There is no evidence JF treated with Dr. Baldonado on or before February 4, 2021.

  ii.    Insured CF was allegedly involved in a motor vehicle accident on March 18, 2021. Thereafter she sought treatment at the Avenue U Clinic. On March 23, 2021 Ideal Care dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription issued by Dr. Alleyne on March 22, 2021. There is no indication Dr. Alleyne examined CF on or before March 22, 2021.

  iii.   Insured IT was allegedly involved in a motor vehicle accident on February 3, 2021. Thereafter she sought treatment at the Avenue V Clinic. On March 8, 2021 Ideal Care dispensed Diclofenac 3% Gel and Baclofen pursuant to prescriptions issued

by Dr. Baldonado on March 2, 2021. There is no evidence IT treated with Dr. Baldonado on or before March 2, 2021

iv.   Insured SS was allegedly involved in a motor vehicle accident on August 19, 2020. Thereafter he sought treatment at the Empire Boulevard Clinic. On October 12, 2020 Ideal Care dispensed Lidocaine 5% Ointment to SS pursuant to a prescription issued by Dr. Duenas on October 8, 2020. There is no evidence SS treated with Dr. Duenas on October 8, 2020.

v.   Insured CF was allegedly involved in a motor vehicle accident on September 12, 2020. Thereafter, she sought treatment at the Empire Boulevard Clinic. On November 20, 2020 Ideal Care dispensed Lidocaine 5% Ointment and Cyclobenzaprine to CF pursuant to a prescription issued by Dr. Pak on November 17, 2020. There is no evidence CF treated with Dr. Pak on November 17, 2020.

vi.   Insured WN was allegedly involved in a motor vehicle accident on October 19, 2020. Thereafter, he sought treatment at the Avenue V Clinic. On October 26, 2020 Ideal Care dispensed Diclofenac 3% Gel and Meloxicam to WN pursuant to a prescription issued by Dr. Rehman on October 22, 2020. There is no evidence WN treated with Dr. Rehman on October 22, 2020.  On November 23, 2020 Ideal Care dispensed Diclofenac 3% Gel and Naproxen to WN pursuant to a prescription issued by Dr. Rehman on November 18, 2020. There is no evidence WN treated with Dr. Rehman on November 18, 2020.

vii.   Insured DJ was allegedly involved in a motor vehicle accident on January 1, 2021. Thereafter, he sought treatment at the Avenue V Clinic. On January 25, 2021 Ideal Care dispensed Diclofenac 3% Gel and Ibuprofen to DJ pursuant to a prescription issued by Dr. Rehman on January 20, 2021. There is no evidence DJ treated with Dr. Rehman on January 20, 2021. On February 22, 2021 Ideal Care dispensed Diclofenac 3% Gel and Naproxen to DJ pursuant to a prescription from Dr. Baldonado issued February 16, 2021, There is no evidence DJ treated with Dr. Baldonado on February 16, 2021.

99.   In keeping with the fact that Defendants established Ideal Care to exploit the Insureds' No-Fault Benefits, without regard to genuine needs of the Insureds, Ideal Care often made no effort to promptly deliver the Fraudulent Pharmaceuticals to Insureds and instead often purported to deliver them weeks after the medications were prescribed, to the extent they were even delivered at all.

100.   For example,

    i.    Insured CL received prescriptions for Diclofenac 3% Gel and Cyclobenzaprine on March 30, 2020 that were purportedly delivered by Ideal Care on April 20, 2020, twenty-one days after the prescription was issued.

    ii.    Insured MA received a prescription for Lidocaine 5% Ointment on November 6, 2020 that was purportedly delivered by Ideal Care on November 25, 2020, nineteen days after the prescription was issued

    iii.    Insured HS received a prescription for Lidocaine 5% Ointment on September 3, 2020 that was purportedly delivered by Ideal Care on September 24, 2020, twenty-one days after the prescription was issued.

    iv.    Insured EW received a prescription for Lidocaine Ointment 5% on July 28, 2020 that was purportedly delivered on August 18, 2020, twenty one days after the prescription was issued.

    i.    Insured NC received prescriptions for Diclofenac Sodium 3% Gel and Cyclobenzaprine on April 27, 2021 that were purportedly delivered by Ideal Care on May 14, 2021, seventeen days after it was issued.

    ii.    Insured AC received a prescription for Lidocaine Ointment 5% on July 28, 2020 that was purportedly delivered by Ideal Care on August 17, 2020, twenty days after the prescription was issued.

    iii.    Insured YF received a prescription for Lidocaine 5% Ointment on September 3, 2020 that was purportedly delivered by Ideal Care on September 22, 2020, nineteen days after the prescription was issued.

    iv.    Insured EF received prescriptions for Diclofenac Sodium 3% Gel and Cyclobenzaprine on April 2, 2021 that were purportedly delivered by Ideal Care on April 20, 2020, eighteen days after it was issued.

    v.    Insured BD received a prescription for Lidocaine 5% Ointment on September 3, 2020 that was purportedly delivered by Ideal Care on September 21, 2020, eighteen days after it was issued.

    vi.    Insured LG received prescriptions for Diclofenac Sodium 3% Gel and Cyclobenzaprine on March 30, 2021 that were purportedly delivered by Ideal Care on April 14, 2021, fifteen days after the prescription was issued.

101.    In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle

accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

102.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

103.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who were treated by the same Prescribing Provider would routinely require the same pharmaceutical products.

104.    Even so, two or more Insureds involved in the same minor motor vehicle accident often received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider. For example:

    i.    On June 10, 2021, two insureds, DI and JE were involved in the same automobile accident. Thereafter DI and JE both received treatment with Emmons Avenue Medical Office, PC ("Emmons Avenue Medical") at a No-Fault Clinic located at 60 Belmont Avenue, Brooklyn, NY (the "Belmont Avenue Clinic") with Ruben Oganesov, M.D. ("Dr. Oganesov"). DI and JE were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations with Dr. Ogranesov DI and JE were both issued prescriptions for Lidocaine 5% Ointment and Celecoxib which were dispensed and billed by Ideal Care. Notably, JE had a history of hypertension, heart failure, hyperlipidemia and atrial fibrillation. Patients with hypertension, heart failure, hyperlipidemia and atrial fibrillation are at a greater risk of cardiovascular events potentially caused by NSAIDs such as Celecoxib.

    ii.    On June 4, 2021 two insureds, PB and RC, were involved in the same automobile accident. Thereafter PB and RC both received treatment with Hong Pak MD PC (the "Pak PC") at the 717 Southern Boulevard Clinic with Dr. Pak. PB and RC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations with Dr. Pak PB and RC were both issued prescriptions for Lidocaine 5% Ointment and Celecoxib dispensed and billed by Ideal Care.

    iii.    On November 8, 2020 two insureds, BaC and BrC, were involved in the same automobile accident. Thereafter BaC and BrC both received treatment with Apex

Medical, P.C. ("Apex Medical") at the Avenue V Clinic with Navdeep Kaur, N.P. ("NP Kaur") under the supervision of Dr. Rehman. BaC and BrC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations BaC and BrC were both issued prescriptions for Diclofenac Sodium Gel 3% and Celebrex. Notably, the simultaneous prescription of Diclofenac Sodium Gel 3% and Celebrex constitutes therapeutic duplication.

iv.   On June 7, 2021 two insureds, ES and GR, were both involved in the same automobile accident. Thereafter ES and GR both received treatment with Emmons Avenue Medical at the Linden Boulevard Clinic with Dr. Oganesov. ES and GR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their examinations with Dr. Oganesov ES and GR were both issued prescriptions for Lidocaine 5% Ointment and Celecoxib dispensed and billed by Ideal Care.

v.    On May 2, 2021 two insureds, AK and LM were both involved in the same automobile accident. Thereafter AK and LM both received treatment with Tri-Borough NY Medical Practice, PC ("Tri-Borough Medical") at the Avenue U Clinic with Dr. Alleyne. AK and LM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations with Dr. Alleyne AK and LM were both issued prescriptions for Lidocaine 5% Ointment dispensed and billed by Ideal Care. Thereafter, AK and LM both underwent follow up examinations at Tri-Borough Medical at the Avenue U Clinic with Inna Levtsenko, NP ("NP Levtsenko"). After their follow up examinations with NP Levtsenko AK and LM were both issued prescriptions for Diclofenac Sodium 3% Gel dispensed and billed by Ideal Care.

vi.   On June 26, 2021 two insureds, SH and JRJ were both involved in the same automobile accident. Thereafter, SH and JRJ both received treatment with Zakaria Medical Service, P.C. ("Zakaria Medical") at a No-Fault Clinic located at 3000 Eastchester Road, Bronx, New York (the "Eastchester Road Clinic") with Muhammad Zakaria, M.D. ("Dr. Zakaria"). SH and JRJ were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations SH and JRJ were both issued prescriptions for Lidocaine 5% Ointment, Ibuprofen 800 MG, and Cyclobenzaprine dispensed and billed by Ideal Care. Thereafter, SH and JRJ underwent follow up examinations with Zakaria Medical at the Eastchester Road Clinic with Dr. Zakaria. After their follow up examinations with Dr. Zakaria SH and JRJ were both issued prescriptions for Ibuprofen 800 MG and Cyclobenzaprine dispensed and billed by Ideal Care.

vii.     On April 19, 2021 two insureds, LG and TH were both involved in the same automobile accident. Thereafter, LG and TH both received treatment with the Pak PC at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, New York (the "Pelham Parkway Clinic") with Dr. Pak. LG and TH were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations LG and TH were both issued prescriptions for Lidocaine 5% Ointment, and Celecoxib dispensed and billed by Ideal Care. Thereafter, SH and JRJ underwent follow up examinations with the Pak PC at the Pelham Parkway Clinic with Dr. Pak. After their follow up examinations with Dr. Pak LG and TH were both prescriptions for Lidocaine 5% Ointment and Celecoxib dispensed and billed by Ideal Care.

viii.    On January 11, 2021 two insureds, LL and DM, were both involved in the same automobile accident. Thereafter DM received treatment with Avenue Medical Care, P.C. ("Avenue Medical") and underwent an examination with Phyllis Gelb, M.D. ("Dr. Gelb"). LL and DM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations LL and DM were both issued prescriptions for Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen dispensed and billed by Ideal Care, despite there being no evidence that LL treated with Dr. Gelb at any time.

ix.     On June 2, 2021 three insureds, AD, KD, and EF, were involved in the same automobile accident. Thereafter AD, KD, and EF received treatment with Tri-Borough Medical at a No-Fault Clinic Located at 160-59 Rockaway Boulevard, Jamaica, New York (the "Rockaway Boulevard Clinic") with John Greco, M.D. ("Dr. Greco"). AD, KD, and EF were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations AD, KD, and EF were all issued prescriptions for Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen dispensed and billed by Ideal Care.

x.     On November 10, 2021 two insureds, ALJ and JR, were both involved in the same automobile accident. Thereafter ALJ and JR both received treatment with Metro Pain at the Avenue U Clinic with Dr. Alleyne. ALJ and JR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations ALJ and JR received Lidocaine 5% Ointment and Naproxen dispensed and billed by Ideal Care.

### A.  **The Fraudulent Lidocaine Ointment Prescriptions**

105.     In accordance with the fraudulent scheme discussed above, Ideal Care routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions, including Topical Lidocaine, pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers in exchange for kickbacks or other financial incentives.

106.     The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Lidocaine because the Defendants could readily buy Topical Lidocaine at low cost but bill GEICO and other New York No-Fault insurers through Ideal Care for huge sums based on egregiously high wholesale prices.

107.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

108.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams. However, the Prescribing Providers virtually never indicated the maximum dosage on any prescriptions.

109.     Despite this, the Prescribing Providers virtually never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.

110.     Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison

sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

111.    Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy of Lidocaine 5% at a fraction of the cost.

112.    Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

113.    Yet the Prescribing Providers never recommended Insureds first try commonly available commercial Lidocaine products to treat their patients' minor aches and pains which they sustained in fender-bender type motor vehicle accidents, instead repeatedly prescribing topical Lidocaine 5% Ointment and directing the prescriptions to Ideal Care, which billed GEICO as much as $2,100.22 for a single tube.

114.    In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions. Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

115.    Lidocaine 5% Ointment was routinely prescribed at the time of the initial examination during the acute stages of the Insureds' pain symptoms (before Insureds even had an opportunity to first try readily available, low-cost, over the counter Lidocaine products or oral pain

medication) and, at times, contemporaneous to oral NSAIDs, muscle relaxers and/or other Fraudulent Topical Pain Products such as Diclofenac Sodium Gel 3%. For example:

i.  On November 12, 2020 Insured DS was allegedly involved in a motor vehicle accident. That same day DS underwent an initial examination with Pak Hong Sik MD Medical Care, PC ("Pak Hong Sik PC") at the Linden Boulevard Clinic with Dr. Pak. On November 16, 2020 Ideal Care dispensed Lidocaine 5% Ointment and Cyclobenzaprine to this Insured pursuant to a prescription from Dr. Pak ordered on November 12, 2020, the same day as the accident.

ii.  On March 6, 2021 Insured PW was allegedly involved in a motor vehicle accident. On March 8, 2021 PW underwent an initial examination with Metro Pain at the Avenue U Clinic with Dr. Alleyne. On March 10, 2021 Ideal Care dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Alleyne ordered on March 8, 2021 one day post-accident.

iii.  On May 16, 2021 Insured ST was allegedly involved in a motor vehicle accident. On May 17, 2021 ST underwent an initial examination with Tri-Borough Medical at the Avenue U Clinic with Dr. Alleyne. On May 20, 2021 Ideal Care dispensed Lidocaine Ointment 5% to this Insured pursuant to a prescription from Dr. Alleyne ordered on May 17, 2021, one day post-accident.

iv.  On June 6, 2021 Insured MW was allegedly involved in a motor vehicle accident. On June 7, 2021 MW underwent an initial examination with Tri-Borough Medical at the Avenue U Clinic with Dr. Alleyne. On June 10, 2021 Ideal Care dispensed Lidocaine Ointment 5% and Naproxen to this Insured pursuant to a prescription from Dr. Alleyne ordered on June 7, 2021, one day post-accident.

v.  On March 20, 2021 Insured RP was allegedly involved in a motor vehicle accident. On March 22, 2021 RP underwent an initial examination with Metro Pain at the Avenue U Clinic with Dr. Alleyne. On March 23, 2021 Ideal Care dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription from Dr. Alleyne ordered on March 22, 2021, two days post-accident.

vi.  On March 6, 2021 Insured BF was allegedly involved in a motor vehicle accident. On March 8, 2021 BF underwent an initial examination with Metro Pain at the Avenue U Clinic with Dr. Alleyne. On March 10, 2021 Ideal Care dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription from Dr. Alleyne ordered on March 8, 2021, two days post-accident.

vii.  On January 23, 2021 Insured RR was allegedly involved in a motor vehicle accident. On January 25, 2021 RR underwent an initial examination at with Metro Pain at the Avenue U Clinic with Dr. Alleyne. On January 26, 2021 Ideal Care dispensed Lidocaine 5% Ointment and Naproxen to this Insured pursuant to a prescription from Dr. Alleyne ordered on January 25, 2021, two days post-accident.

    viii.    On November 10, 2020 Insured KS was allegedly involved in a motor vehicle accident. On November 12, 2020 KS underwent an initial examination with Pak Hong Sik PC at the Linden Boulevard Clinic with Dr. Pak. On November 16, 2020 Ideal Care dispensed Lidocaine 5% Ointment and Cyclobenzaprine to this Insured pursuant to a prescription from Dr. Pak ordered on November 12, 2020, two days post-accident.

    ix.    On June 18, 2021 Insured EP was allegedly involved in a motor vehicle accident. On June 22, 2021 EP underwent an initial examination with Conrad Cean, M.D. ("Dr. Cean"). On June 24, 2021 Ideal Care dispensed Lidocaine Ointment 5% and Naproxen to this Insured pursuant to the prescription from Dr. Cean ordered on June 22, 2021, four days post-accident.

    x.    On December 17, 2020 Insured JS was allegedly involved in a motor vehicle accident. On December 21, 2020 JS underwent an initial examination with Metro Pain at the Avenue U Clinic with Deonarine Rampershad, NP ("NP Rampershad"). On December 23, 2020 Ideal Care dispensed Lidocaine 5% Ointment and Ibuprofen to this Insured pursuant to the prescription from NP Rampershad ordered on December 21, 2020, four days post-accident.

116.    The Topical Lidocaine was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of medications approved by the Unites States Food and Drug Administration ("FDA"), with proven therapeutic effects, and available over-the-counter at a fraction of the cost.

117.    There is no legitimate medical reason for the Prescribing Providers to prescribe large volumes of Lidocaine 5% Ointment to Insureds, particularly given the availability of over-the-counter medications, as well as the lack of indication for use for the Insureds.

118.    There is no legitimate medical reason why Ideal Care repeatedly dispensed Lidocaine 5% Ointment to Insureds, particularly given the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

119.    In keeping with the fact that Topical Lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

120.    In further keeping with the fact that the Topical Lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers often failed to address whether the Topical Lidocaine prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

121.    Ideal Care typically billed GEICO between $1,679.00 and $2,100.22 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $1,023,800.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

122.    The Defendants' egregious billing coupled with the fact that the Prescribing Providers often failed to properly document the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, or for Ideal Care to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

**B.    The Fraudulent Topical Diclofenac Gel Prescriptions**

123.    In addition to the egregious number of Topical Lidocaine prescriptions dispensed by the Defendants, Ideal Care routinely billed GEICO for exorbitantly priced Topical Diclofenac, pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

124.     The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but have Ideal Care bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

125.     Topical Diclofenac is an NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

126.     Topical Diclofenac does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

127.     Moreover, some clinical studies of topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

128.     The Prescribing Providers routinely prescribed and the Defendants routinely dispensed Topical Diclofenac 3% despite the fact that none of the Insureds suffered from actinic keratoses, treatment of which is the only FDA approved use of Topical Diclofenac 3%.

129.     The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating the potential for serious cardiovascular and gastrointestinal risks.

130.     A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

131.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular

thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

132.    Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs –  such as celecoxib, meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products such as Lidocaine 5% Ointment.

133.    Prescribing Topical Diclofenac, while simultaneously prescribing  or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

134.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

135.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

136.    Nevertheless, the Prescribing Providers consciously prescribed and the Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or Fraudulent

Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

137.     In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with concurrent administration of diclofenac sodium.

138.     The Prescribing Providers engaged in therapeutic duplication by simultaneously prescribing oral NSAIDs and Topical Diclofenac, and often prescribed duplicative NSAIDs contemporaneous to muscle relaxants, such as Cyclobenzaprine and Baclofen, and/or other Fraudulent Topical Pain Products.  For example:

  i.   Insured BR was allegedly involved in a motor vehicle accident on March 4, 2021. Thereafter BR sought treatment with BL Pain Management ("BL Pain") at a No-Fault Clinic located at 560 Prospect Avenue, Bronx, New York (the "Prospect Avenue Clinic") and underwent an initial examination with Alexander Niyazov, P.A. ("PA Niyazov") on May 10, 2021. Despite the inherent risks of therapeutic duplication, PA Niyazov prescribed a topical and an oral NSAID (Diclofenac Sodium 3% External Gel and Ibuprofen) along with a muscle relaxant (Baclofen). On May 12, 2021 Ideal Care dispensed and billed for Diclofenac Sodium Gel 3%, Ibuprofen, and Baclofen pursuant to PA Niyazov's prescription.

  ii.  Insured BJ was allegedly involved in a motor vehicle accident on May 10, 2021. Thereafter BJ sought treatment with Integrative Family Health NP PLLC ("Integrative Family Health") at a No-Fault Clinic located at 240-19 Jamaica Avenue, Bellerose, New York (the "Jamaica Avenue Clinic") and underwent an initial examination with Igor Zilberman, N.P. ("NP Zilberman") on May 11, 2021. Despite the inherent risks of therapeutic duplication, NP Zilberman prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Celecoxib) along with a muscle relaxant (Cyclobenzaprine). On May 17, 2021 Ideal Care dispensed and billed for Diclofenac Sodium Gel 3%, Celecoxib, and Cyclobenzaprine pursuant to NP Zilberman's prescription.

  iii. Insured ES was allegedly involved in a motor vehicle accident on January 15, 2021. Thereafter, ES sought treatment with Wellness Medical of Corona, P.C. ("Wellness Medical") at the Avenue V Clinic and underwent an examination with Dr. Baldonado. Despite the inherent risks of therapeutic duplication on February

16, 2021 Dr. Baldonado prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Naproxen). There is no evidence ES treated with Dr. Baldonado on February 16, 2021. On December 2, 2020 Ideal Care dispensed and billed for Diclofenac Sodium Gel 3% and Naproxen pursuant to Dr. Baldonado's prescription.

iv.    Insured AB was allegedly involved in a motor vehicle accident on May 8, 2021. Thereafter, AB sought treatment with Integrative Family Health at the Jamaica Avenue Clinic and underwent an examination with NP Zilberman. Thereafter, despite the inherent risks of therapeutic duplication, on May 11, 2021 NP Zilberman prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Celecoxib) as well as a muscle relaxant (Cyclobenzaprine). On May 17, 2021 Ideal Care dispensed and billed for Diclofenac Sodium Gel 3%, Celecoxib, and Cyclobenzaprine pursuant to NP Zilberman's prescription.

v.    Insured JA was allegedly involved in a motor vehicle accident on September 11, 2020. Thereafter, JA sought treatment at the Avenue V Clinic. Despite the inherent risks of therapeutic duplication, on November 30, 2020 Dr. Rehman prescribed a topical and an oral NSAID (Diclofenac Sodium Gel 3% and Celebrex). There is no evidence JA treated with Dr. Rehman on November 30, 2020. On December 2, 2020 Ideal Care dispensed and billed for Diclofenac 3% Gel and Celecoxib pursuant to Dr. Rehman's prescription.

vi.    Insured QA was allegedly involved in a motor vehicle accident on June 1, 2021. Thereafter, QA sought treatment with Integrative Family Health at the Jamaica Avenue Clinic with NP Zilberman. Despite the inherent risks of therapeutic duplication, on June 22, 2021 NP Zilberman prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Naproxen) as well as a muscle relaxer (Cyclobenzaprine). On June 29, 2021 Ideal Care dispensed and billed for Diclofenac Sodium Gel 3%, Naproxen, and Cyclobenzaprine pursuant to NP Zilberman's prescription.

vii.    Insured FA was allegedly involved in a motor vehicle accident on November 10, 2020. Thereafter, FA sought treatment with Tong Li MD PC ("Tong Li PC") at a No-Fault Clinic located at 3626 East Tremont Avenue, Suite #101, Bronx, New York (the "East Tremont Avenue Clinic"). Despite the inherent risks of therapeutic duplication, on November 16, 2020 Tong Li, M.D. ("Dr. Li") prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Meloxicam). Furthermore, FA indicated he was taking Ibuprofen, another NSAID pain reliever, at the time Dr. Li prescribed Diclofenac Sodium 3% Gel and Meloxicam. On November 17, 2020 Ideal Care dispensed and billed for Diclofenac 3% Gel and Meloxicam pursuant to Dr. Li's prescription.

viii.    Insured JB was allegedly involved in a motor vehicle accident on January 27, 2021. Thereafter, JB sought treatment at the Avenue V Clinic and underwent an examination with Dr. Baldonado. Despite the inherent risks of therapeutic duplication, on February 16, 2021 Dr. Baldonado prescribed a topical and an oral

NSAID (Diclofenac Sodium 3% Gel and Naproxen). On February 17, 2021 Ideal Care dispensed and billed for Diclofenac 3% Gel and Naproxen pursuant to Dr. Baldonado's prescription.

ix.   Insured OBH was allegedly involved in a motor vehicle accident on June 26, 2021. Thereafter, OBH sought treatment with Integrative Family Health and underwent an examination with NP Zilberman. Despite the inherent risks of therapeutic duplication, on July 6, 2021 NP Zilberman prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Naproxen) as well as a muscle relaxer (Cyclobenzaprine). On August 17, 2021 Ideal Care dispensed and billed for Diclofenac Sodium Gel 3%, Naproxen, and Cyclobenzaprine pursuant to NP Zilberman's prescription.

x.    Insured CH was allegedly involved in a motor vehicle accident on November 2, 2020. Thereafter, CH sought treatment with Apex Medical at the Avenue V Clinic. Despite the inherent risks of therapeutic duplication, on November 9, 2020 Dr. Rehman prescribed a topical and an oral NSAID (Diclofenac Sodium 3% Gel and Naproxen.) On November 13, 2020 Ideal Care dispensed and billed for Diclofenac 3% Gel and Naproxen pursuant to Dr. Rehman's prescription. There is no evidence CH treated with Dr. Rehman on November 9, 2020. Furthermore, the Insured's medical history - as detailed by the Insured's hospital records- indicates the Insured is allergic to Aspirin, an NSAID pain reliever.

139.    In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with concurrent administration of Topical Diclofenac.

140.    The Topical Diclofenac was prescribed and dispensed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

141.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the

initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

142.     In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers rarely addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

143.     Ideal Care typically billed GEICO approximately $2,599.00 for a single tube of Diclofenac Sodium Gel 3% and, to-date, has billed GEICO over $594,000.00 for Diclofenac Sodium Gel 3%.

144.     Moreover, the Prescribing Providers at times prescribed and the Defendants dispensed the Topical Pain Products contemporaneous to muscle relaxants such as Cyclobenzaprine.

145.     In accordance with best practices, a prescription for a seven-to-ten-day supply of Cyclobenzaprine may be appropriate during the *acute* stages of injury.  However, the Prescribing Providers often prescribed, and the Defendants dispensed, thirty-day supplies of Cyclobenzaprine and at times such prescriptions were issued well past the acute stages of injury.  For example:

    i.    Insured TK was allegedly involved in a motor vehicle accident on July 22, 2020. Thereafter TK sought treatment with Pars Medical, PC ("Pars Medical") at a No-Fault Clinic located at 1 Fulton Avenue, Suite 8, West Hempstead, New York (the "Fulton Avenue Clinic") and underwent an examination with Michael Garbulsky, PA ("PA Garbulsky") and Isaac Kreizman, M.D. ("Dr. Kreizman"). On May 10, 2021 PA Garbulsky issued prescriptions for Mobic, Lidocaine 5% Ointment, and a thirty day supply of Cyclobenzaprine, more than nine months post-accident. On May 14, 2021 Ideal Care dispensed Meloxicam (Mobic), Lidocaine Ointment 5%, and Cyclobenzaprine to this Insured pursuant to the prescriptions from PA Garbulsky dated May 10, 2021.

    ii.    Insured SS was allegedly involved in a motor vehicle accident on September 30, 2020. Thereafter SS sought treatment with Avenue Medical Care and underwent

an examination Dr. Gelb. On June 3, 2021 Dr. Gelb issued prescriptions for Naproxen Sodium, Lidocaine 5% Ointment, and a 30 day supply of Cyclobenzaprine, more than eight months post-accident. On June 9, 2021 Ideal Care dispensed Lidocaine Ointment 5%, Naproxen Sodium, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Gelb dated June 3, 2021.

iii.   Insured TB was allegedly involved in a motor vehicle accident on October 26, 2020. Thereafter TB sought treatment with LR Medical, PLLC ("LR Medical") and underwent an examination with Leonid Litovskiy, PA ("PA Litovskiy"). On June 15, 2021 PA Litovskiy issued prescriptions for Mobic, Lidocaine 5% Ointment, and a thirty day supply of Cyclobenzaprine, more than seven months post-accident. On June 18, 2021 Ideal Care dispensed Lidocaine Ointment 5%, Meloxicam (Mobic), and Cyclobenzaprine to this Insured pursuant to the prescriptions from PA Litovskiy dated June 15, 2021.

iv.   Insured OR was allegedly involved in a motor vehicle accident on November 12, 2020. Thereafter OR sought treatment with Avenue Medical Care and underwent an examination with Dr. Gelb. On May 18, 2021 Dr. Gelb issued prescriptions for Naproxen, Lidocaine 5% Ointment, and a 30 day supply of Cyclobenzaprine, more than six months post-accident. On May 27, 2021 Ideal Care dispensed Lidocaine Ointment 55, Naproxen, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Gelb dated May 18, 2021.

v.   Insured NC was allegedly involved in a motor vehicle accident on November 30, 2020. Thereafter, on May 25, 2021 Dr. Gelb issued prescriptions for Naproxen, Lidocaine 5% Ointment, and a 30 day supply of Cyclobenzaprine, nearly six months post-accident. There is no evidence NC treated with Dr. Gelb at any time on, or prior to, May 25, 2021. On June 4, 2021 Ideal Care dispensed Lidocaine Ointment 5%, Naproxen and Cyclobenzaprine to this Insured pursuant to the prescription from Dr. Gelb dated May 25, 2021.

vi.   Insured ER was allegedly involved in a motor vehicle accident on December 23, 2020. Thereafter, ER sought treatment with Integrative Family Health at the Flatbush Avenue Clinic and underwent an examination with NP Levtsenko. On June 10, 2021 NP Zilberman issued prescriptions for Lidocaine 5% Ointment and a thirty day supply of Cyclobenzaprine, nearly six months post accident. On June 23, 2021 Ideal Care dispensed Lidocaine Ointment 5% and Cyclobenzaprine to this Insured pursuant to the prescriptions from NP Zilberman dated June 10, 2021.

vii.   Insured JP was allegedly involved in a motor vehicle accident on October 22, 2020. Thereafter, JP sought treatment with Integrative Family Medical at the Flatbush Avenue Clinic with NP Zilberman. On April 8, 2021 NP Zilberman issued prescriptions for Diclofenac Sodium 3% Gel and a thirty day supply of Cyclobenzaprine over five months post accident. On April 13, 2021 Ideal Care dispensed Diclofenac Sodium Gel 3% and Cyclobenzaprine to this Insured pursuant to prescriptions from NP Zilberman dated April 8, 2021.

viii. Insured NP was allegedly involved in a motor vehicle accident on December 16, 2020. Thereafter NP sought treatment with Avenue Medical Care with Dr. Gelb. On May 18, 2021 Dr. Gelb prescribed Lidocaine 5% Ointment, Naproxen, and a thirty day supply of Cyclobenzaprine over five months post accident. On June 2, 2021 Ideal Care dispensed Lidocaine Ointment 5%, Naproxen, and Cyclobenzaprine to this Insured pursuant to prescriptions from Dr. Gelb dated May 18, 2021.

ix. Insured JG was allegedly involved in a motor vehicle accident on October 14, 2020. Thereafter JG sought treatment with Integrative Family Health at the Jamaica Avenue Clinic and underwent an examination with NP Zilberman. On March 23, 2021 NP Zilberman issued prescriptions for Lidocaine 5% Ointment and a thirty-day supply of Cyclobenzaprine over five months post-accident. On March 29, 2021 Ideal Care dispensed Lidocaine 5% Ointment and Cyclobenzaprine to this Insured pursuant to prescriptions from NP Zilberman dated March 23, 2021.

x. Insured YW was allegedly involved in a motor vehicle accident on January 30, 2021. Thereafter YW sought treatment with Integrative Family Health at the Jamaica Avenue Clinic and underwent an examination with NP Zilberman. On June 22, 2021 NP Zilberman issued prescriptions for Lidocaine 5% Ointment and a thirty day supply of Cyclobenzaprine nearly five months post-accident. On July 9, 2021 Ideal Care dispensed Lidocaine Ointment 5% and Cyclobenzaprine to this Insured pursuant to prescriptions from NP Zilberman dated June 22, 2021.

146. Furthermore, as a part of the fraudulent scheme, in order to conceal the volume of pharmaceuticals dispensed to a single insured, the Prescribing Providers and Clinic Controllers routinely steered prescriptions issued on a single date, or on proximate dates, to a series of pharmacies including Ideal Care, despite the fact that, upon information and belief, the pharmacies carry the same or similar pharmaceuticals and were each individually capable of filling the complete prescription.

147. For example,

i. Insured TJF was allegedly involved in a motor vehicle accident on November 1, 2020. Thereafter TJF sought treatment with Metro Pain at the Avenue U Clinic and underwent an examination with Dr. Alleyne on December 14, 2020. According to Dr. Alleyne's treatment notes, Dr. Alleyne prescribed Flexeril, Naprosyn, Lidoderm 5% Patches, Lidocaine 5% Ointment, and Somnicin. On December 16, 2020 TMVQS Corp. d/b/a Trinity Pharmacy ("Trinity Pharmacy") dispensed Somnicin to this Insured pursuant to a prescription issued by Dr. Alleyne on

December 14, 2020. On December 17, 2020 Ideal Care dispensed Lidocaine 5% Ointment and Naproxen to this Insured pursuant to a separate prescription issued by Dr. Alleyne on December 14, 2020. On December 28, 2020 Shop-N-Save Pharmacy, Inc. ("Shop-N-Save") dispensed Lidocaine 5% Patches to this Insured pursuant to a prescription issued by Dr. Alleyne on December 14, 2020. On December 29, 2020 Shop-N-Save dispensed Dihydroergotamine to this Insured pursuant to a separate prescription issued by Dr. Alleyne on December 14, 2020.

ii. Insured JF was allegedly involved in a motor vehicle accident on March 6, 2021. Thereafter, JF sought treatment with Metro Pain at the Avenue U Clinic and underwent an examination with Dr. Alleyne on March 8, 2021. According to Dr. Alleyne's treatment notes Dr. Alleyne prescribed Naprosyn, Lidoderm 5% Patches, Lidocaine 5% Ointment, and Somnicin. On March 9, 2021 Trinity Pharmacy dispensed Somnicin to this Insured pursuant to a prescription issued by Dr. Alleyne on March 8, 2021. On March 10, 2021 Ideal Care dispensed Lidocaine 5% Ointment and Naproxen to this Insured pursuant to a separate prescription issued by Dr. Alleyne on March 8, 2021. On March 20, 2021 Shop-N-Save dispensed Lidocaine Film ER 5% and Naproxen to this Insured pursuant to a separate prescription issued by Dr. Alleyne on March 8, 2021.

iii. Insured BF was allegedly involved in a motor vehicle accident with JF on March 6, 2021. Thereafter, BF sought treatment with Metro Pain at the Avenue U Clinic and underwent an examination with Dr. Alleyne on March 8, 2021. According to Dr. Alleyne's treatment notes Dr. Alleyne prescribed Flexeril, Naprosyn, Lidoderm 5% Patches, Lidocaine 5% Ointment, and Somnicin. On March 9, 2021 Trinity Pharmacy dispensed Somnicin to this Insured pursuant to a prescription issued by Dr. Alleyne on March 8, 2021. On March 10, 2021 Ideal Care dispensed Lidocaine 5% Ointment to this Insured pursuant to a separate prescription issued by Dr. Alleyne on March 8, 2021. On March 20, 2021 Shop-N-Save dispensed Lidocaine 5% Patches and Naproxen to this Insured pursuant to a separate prescription issued by Dr. Alleyne.

iv. Insured SLJ was allegedly involved in a motor vehicle accident on September 2, 2020. Thereafter SLJ sought treatment with Metro Pain at the Avenue U Clinic and underwent an examination with Dr. Alleyne on September 21, 2020. According to Dr. Alleyne's treatment notes, Dr. Alleyne prescribed Naprosyn, Lidoderm 5% Patches, Lidocaine 5% Ointment, and Somnicin. On September 22, 2020 Trinity Pharmacy dispensed Somnicin to this Insured pursuant to a prescription issued by Dr. Alleyne on September 21, 2020. On September 23, 2020 Ideal Care dispensed Lidocaine 5% Ointment and Naproxen to this Insured pursuant to a separate prescription issued by Dr. Alleyne on September 21, 2020. On September 30, 2020 ASG Rx Corp. ("ASG RX") dispensed Lidocaine 5% Patches to this Insured pursuant to a separate prescription issued by Dr. Alleyne on September 21, 2020.

v. Insured JD was allegedly involved in a motor vehicle accident on November 29, 2020. Thereafter JD sought treatment with Apex Medical with Dr. Rehman at the Avenue V Clinic. February 3, 2021 Ideal Care dispensed Diclofenac 3% Gel and

Naproxen to this Insured pursuant to a prescription issued by Dr. Rehman on January 27, 2021. On February 9, 2021 S&K Warbasse Pharmacy, Inc. ("S&K Pharmacy") dispensed "Lidothol Pad 4.5%/5%" to this Insured pursuant to a prescription issued by Dr. Rehman on January 27, 2021. On Febrayr 22, 2021 Essential Rx dispensed Lidocaine 5% Ointment and Celecoxib to this Insured pursuant to prescriptions issued by Dr. Rehman on February 17, 2021. Thereafter, on March 4, 2021 Trinity Pharmacy dispensed Somnicin to JD pursuant to a prescription issued by Dr. Baldonado on March 2, 2021. On March 8, 2021 Ideal Care dispensed Diclofenac 3% Gel and Baclofen to JD pursuant to a separate prescription issued by Dr. Baldonado on March 2, 2021. On March 10, 2021 S&K Pharmacy dispensed "Lidothol Pad 4.5%/5%" to JD pursuant to a separate prescription issued by Dr. Baldonado on March 2, 2021. On April 1, 2021 D&D Drugs, Inc. ("D&D Drugs") dispensed Diclofenac Sodium 3% Gel and Baclofen to JD pursuant to a prescription issued by Dr. Baldonado on March 8, 2021. On April 9, 2021 Floral Park Drugs, Inc. ("Floral Park Drugs") dispensed Celecoxib and Lidocaine 5% Ointment to this Insured pursuant to a separate prescription issued by Dr. Baldonado on April 6, 2021.

vi.   Insured SD was allegedly involved in a motor vehicle accident on January 18, 2021. Thereafter SD sought treatment at the Avenue V Clinic with Wellness Medical of Corona, PC ("Wellness Medical") with Dr. Baldonado. On February 10, 2021 Trinity Pharmacy dispensed Somnicin to SD pursuant to a prescription issued by Dr. Baldonado on February 4, 2021. On February 10, 2021 Ideal Care dispensed Diclofenac 3% Gel and Naproxen to SD pursuant to a prescription issued by Dr. Baldonado on February 8, 2021. On March 8, 2021 Ideal Care dispensed Diclofenac 3% Gel and Baclofen to SD pursuant to a prescription issued by Dr. Baldonado on March 2, 2021. On March 15, 2021 Essential Rx dispensed Lidocaine 5% Ointment and Celecoxib pursuant to prescriptions from Dr. Baldonado issued March 2, 2021. On March 19, 2021 Volfi, Inc. ("Volfi") dispensed "Lidothol Pad 4.5%/5%" to SD pursuant to a prescription issued by Dr. Baldonado on March 12, 2021. On March 31, 2021 Trinity Pharmacy dispensed Somnicin to SD pursuant to a prescription issued by Dr. Baldonado on March 30, 2021. On April 9, 2021 Volfi dispensed "Lidothol Pad 4.5%/5%" to SD pursuant to a prescription issued by Dr. Baldonado on March 26, 2021. On April 12, 2021 Essential Rx dispensed Lidocaine 5% Ointment and Celecoxib pursuant to prescriptions from Dr. Baldonado issued March 30, 2021. On April 23, 2021 Floral Park Drugs dispensed Lidocaine 5% Ointment and Celecoxib pursuant to prescriptions from Dr. Baldonado issued April 20, 2021. On May 5, 2021 Trinity Pharmacy dispensed Somnicin to SD pursuant to a prescription issued by Dr. Baldonado on May 3, 2021. On May 24, 2021 D&D Drugs dispensed Lidocaine 5% Ointment and Celecoxib pursuant to a prescription from Dr. Baldonado issued May 11, 2021.

vii.  Insured QB was allegedly involved in a motor vehicle accident on September 12, 2020. Thereafter, QB sought treatment at the Avenue V Clinic. On October 29, 2020 AVK Rx, Inc. ("AVK") dispensed Celecoxib and "Lidothol 4.5%/5% Film" to QB pursuant to prescriptions issued by Dr. Rehman on October 27, 2020. On

October 30, 2020, Ideal Care dispensed Diclofenac 3% Gel and Baclofen to QB pursuant to a prescription issued by Dr. Rehman on October 27, 2020.

### IV. The Illegal, Collusive Arrangements Among Ideal Care, the Prescribing Providers and the Clinic Controllers

148. New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

149. New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7).  In fact, New York Education Law § 6811(7) makes such agreements criminal.

150. Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to Ideal Care so that the Defendants could bill GEICO huge sums.

151. In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

152. The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported

to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain.

153.     The Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course and not based on medical evidence without any recommendation that patients first try over-the-counter products; and that the Fraudulent Topical Pain Products were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

154.     The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds did not have the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Ideal Care, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from Ideal Care in Kings County, New York and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

155.     The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Ideal Care and to ensure that the Defendants benefitted financially from the prescriptions.

156.     Rather, the Fraudulent Pharmaceuticals were dispensed by Ideal Care directly from the front desk staff at the various No-Fault Clinics or, alternatively, were automatically delivered to the Insured's homes.

157.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

158.     The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Ideal Care rather than the multitude of other pharmacies that were equally capable of dispensing the prescriptions and were often more convenient to many of the patients.

159.     The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to Ideal Care, unless they profited from their participation in the illegal scheme.

160.     But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Ideal Care.

161.     The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

162.     Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Ideal Care.

163.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

## V.   **The Fraudulent Billing the Defendants Submit or Cause to be Submitted to GEICO**

164.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

165.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

166.     Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

167.     For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

168.     The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

169.     The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate Ideal Care's billing and maximize their profits.

170.     In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescription forms; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) an itemized invoice which included the Insureds' demographics, dates the prescription was purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Prescribing Provider; (iv) a copy of the prescription; and (v) the executed AOB assigning the Insureds' benefits to Ideal Care.

171.     The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

172.     In fact, Ideal Care never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

173.     Ideal Care paid only a fraction of the "average wholesale price" for the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with Ideal Care's billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

174.     Further, upon information and belief, Ideal Care often did not actually purchase topical pain products under the particular NDC number used in the billing, and instead purchased

topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

### VI. The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

175. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Ideal Care seeking payment for pharmaceuticals for which Ideal Care is ineligible to receive.

176. These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

  i.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

  ii.  The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Ideal Care for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

  iii. The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal and invalid prescriptions; and

iv.     The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

## VII.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

177.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

178.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

179.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

180.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

181.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

182.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Ideal Care continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Ideal Care has been engaged in fraud.

183.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO also ensures that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

184.     The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $527,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

185.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

186.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

187.     There is an actual case in controversy between GEICO and the Defendants regarding approximately $1.17 million in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Ideal Care.

188.    Ideal Care has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because Ideal Care billed for pharmaceutical products that were medical unnecessary, prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care based on medical evidence.

189.    Ideal Care has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ideal Care in exchange for unlawful kickbacks and other financial incentives.

190.    Ideal Care has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Ideal Care pursuant to the illegal and invalid prescriptions.

191.    Ideal Care has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Ideal Care dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

192.    The Defendants, including Ideal Care, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

193.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Ideal Care has no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against Naishuler**
**Violation of RICO, 18 U.S.C. § 1962(c))**

194.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

195.    Ideal Care is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

196.    Naishuler knowingly has conducted and/or participated, directly or indirectly, in the conduct of Ideal Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges seeking payments that Ideal Care was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ideal Care in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal and invalid prescriptions. A representative sample of the fraudulent bills and

corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

197.    Ideal Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Naishuler operated Ideal Care, inasmuch as Ideal Care was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Ideal Care to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Ideal Care to the present day.

198.    Ideal Care is inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Ideal Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

199.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $527,000.00 pursuant to the fraudulent bills submitted by the Defendants.

200.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against All Defendants**
**(Common Law Fraud)**

201.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

202.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Ideal Care.

203.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care based on medical evidence; (ii) in every claim, the representation that Ideal Care was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ideal Care in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Ideal Care was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal and invalid prescriptions; and (iv) in every claim, the representation that Ideal Care was acting in

accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

204.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ideal Care that were not compensable under the No-Fault Laws.

205.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $527,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Ideal Care.

206.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

207.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

208.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

209.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

210.    When GEICO paid the bills and charges submitted by or on behalf of Ideal Care for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

211.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

212.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

213.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $527,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Ideal Care has no right to receive payment for any pending bills, amounting to approximately $1.17 million in charges submitted to GEICO;

B.    On the Second Claim For Relief against Naishuler, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $527,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim for Relief against the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $527,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim for Relief against all the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $527,000.00, together with punitive damages.

Dated: Uniondale, New York
            June 20, 2022

RIVKIN RADLER LLP

By:    /s/ *Michael A. Sirignano, Esq.*
            Michael A. Sirignano (MS 5263)
            Barry I. Levy (BL 2190)
            Joanna B. Rosenblatt (JR 3359)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*